NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 16, 2008
Decided January 14, 2009

**Before**

TERENCE T. EVANS, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 08-2881

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District |
| *Plaintiff-Appellee,* | Court for the Central District of Illinois. |
| | |
| *v.* | No. 07-CR-40081-001 |
| | |
| YVES LEBON, | Michael M. Mihm, |
| *Defendant-Appellant.* | *Judge.* |

**O R D E R**

Yves LeBon pleaded guilty to both possession with intent to distribute cocaine and improper entry by an alien, reserving the right to appeal the district court's denial of his motion to suppress the cocaine. The district court sentenced LeBon to 120 months' imprisonment with five years' supervised release. LeBon appeals the district court's denial of the suppression motion. Because the vehicle search that revealed the cocaine was consensual, we affirm.

## Background

Yves LeBon, a Canadian citizen, entered the United States in August 2007 in order to transport drugs from California to New York. After receiving the drugs in California, LeBon drove east in his rented car on Interstate 80. Andrew Fratzke, an Illinois police trooper, stopped LeBon when he noticed LeBon's car weaving in its lane and crossing the white shoulder line. After pulling LeBon over, Fratzke approached the car and spoke to LeBon through the open passenger window. He told LeBon that the weaving suggested that he was intoxicated or falling asleep. LeBon explained that he was reaching for a water bottle in a cooler in the front passenger seat, pointing out the cooler and a small water spill on his pants. Fratzke asked LeBon for a driver's license and the rental agreement, which LeBon provided. Fratzke then asked LeBon where he was headed, and LeBon explained that his semi truck had broken down in California and that because it would take ten to twelve days to repair, he was driving back to his home in Canada. Fratzke asked why he didn't fly back to Canada, but LeBon said that his boss wanted him to drive back.

After checking LeBon's driver's license and his car's license plate, Fratzke returned LeBon his papers and issued a warning citation. Fratzke told LeBon to have a safe trip and began to walk back to his vehicle. A few seconds later while the squad car's emergency lights were still oscillating, he turned around, reapproached the passenger side of LeBon's car, leaned his head in the car (the government disputes this particular point), and said, "Hey, before you go, can I ask you a couple more questions, real quick?" LeBon responded, "Okay."

With LeBon's assent to further questioning, Fratzke again asked LeBon about his travel plans, asking why he would drive three days back to Canada to stay one night and then drive all the way back. LeBon replied that the trip would actually take four days and that he wasn't sure how long the repairs would take. Fratzke asked why he didn't just stay in a hotel in California to wait for the repairs, but LeBon said the hotel and food would be too expensive there.

Fratzke then asked whether there was anything illegal in the car. LeBon responded that there was not. Then Fratzke asked for permission to search the trunk, and LeBon said, "Okay." When Fratzke looked in the trunk, he saw a black duffle bag. Fratzke asked permission to search the trunk further, and LeBon again consented. Fratzke opened the duffle bag, where he saw kilo-sized bricks that he believed contained narcotics. Fratzke arrested LeBon for illegal narcotics, placing him in the back of his squad car. Fratzke ran his drug detection canine around the car; the dog alerted to the presence of narcotics in the trunk. Fratzke searched the trunk further, uncovering six duffle bags containing 119 kilograms of cocaine.

LeBon moved to suppress the cocaine, arguing that it was the product of an unlawful search and seizure. After hearing testimony from the trooper and the arguments of counsel, the district court denied the motion. The court concluded that the initial traffic stop was supported by probable cause and was therefore justified. The court also concluded that Fratzke conducted the initial stop reasonably and took a reasonable amount of time. According to the court, when Fratzke returned LeBon's papers and wished him a safe trip, LeBon was free to go. The court found that when Fratzke reapproached LeBon's vehicle and asked if LeBon would stay to answer more questions, LeBon freely gave his consent. Additionally, the court concluded that LeBon validly consented to the search of the trunk. Accordingly, the district court denied the motion to suppress evidence.

**Analysis**

On appeal, LeBon concedes that the initial traffic stop was lawful because Fratzke had probable cause to believe LeBon had violated a traffic law, and he agrees that the stop up to the point of returning his papers was reasonable. He argues, however, that when Fratzke returned to LeBon's vehicle, he was not free to leave and was therefore "seized" because Fratzke physically stuck his head inside LeBon's car and the emergency lights were still activated on the police car. Although he agreed to the search of his trunk, LeBon argues that his consent was coerced because a reasonable person would not have believed that he was free to leave at that point.

When reviewing the denial of a motion to suppress, we assess legal questions de novo and factual findings for clear error. *United States v. Groves*, 530 F.3d 506, 509 (7th Cir. 2008). The Fourth Amendment allows consensual, warrantless searches and seizures, but the government bears the burden of showing that the consent was freely and voluntarily given. *United States v. Johnson*, 495 F.3d 536, 541 (7th Cir. 2007). The Supreme Court has held that an individual's encounter with a police officer is consensual when an officer merely approaches to ask a few questions. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968); *Acevedo v. Canterbury*, 457 F.3d 721, 724 (7th Cir. 2006). Whether liberty is restrained is based on the totality of the circumstances:

> Determining whether a seizure has occurred is a highly fact-bound inquiry, but the following are relevant factors: whether the encounter took place in a public place or whether police removed the person to another location; whether the police told the person he was not under arrest and was free to leave; whether the police informed the person that he was suspected of a crime or the target of an investigation; whether the person was deprived of

identification or other documents without which he could not leave (such as a driver's license or train or airline ticket); and whether there was any limitation of the person's movement such as physical touching, display of a weapon, or other coercive conduct on the part of the police that indicates cooperation is required.

*United States v. Tyler*, 512 F.3d 405, 409-10 (7th Cir. 2008).

In light of the circumstances surrounding the encounter, the second phase of the stop and the trunk search were consensual. First, the encounter took place publicly after the concededly lawful stop concluded, and LeBon was never removed to another location. Also, Fratzke had already returned LeBon's driver's license and rental agreement and added, "We'll get you out of here. Have a safe trip." This means, as LeBon concedes, that he was free to leave rather than forced to submit to questions. Fratzke's further questioning following LeBon's consent took only a few minutes, a reasonable length of time. *United States v. Figueroa-Espana*, 511 F.3d 696, 703 (7th Cir. 2007); *United States v. Muriel*, 418 F.3d 720, 726 (7th Cir. 2005); *United States v. Carpenter*, 406 F.3d 915, 916-17 (7th Cir. 2005); *United States v. Childs*, 277 F.3d 947, 953-54 (7th Cir. 2002) (en banc). Finally, Fratzke never touched LeBon or brandished a weapon to show force during the second encounter. Thus, all factors point against a seizure and toward voluntary consent for the continued detention and the trunk search. *See Figueroa-Espana*, 511 F.3d at 702 (validating a motorist's consent to further questioning after the officer has finished writing a citation and returned a motorist's papers); *United States v. Rivera*, 906 F.2d 319, 323 (7th Cir. 1990) (same).

LeBon resists this conclusion by contending that Fratzke's head was inside LeBon's vehicle when he asked if LeBon would answer more questions, thereby vitiating the consent. But even if this occurred, such minor intrusions are not coercive. *See United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000) (holding that leaning on car door did not make encounter nonconsensual); *United States v. Lopez-Guzman*, 246 F. Supp. 2d 1155, 1162 (D. Kan. 2003) (same); *see also United States v. McGill*, 125 F.3d 642, 644 (8th Cir. 1997) (holding consent freely given even after officer leaned into vehicle). LeBon also contends that the ongoing flashing lights created a coercive atmosphere, but conceded that he was free to go after his papers were returned (and the lights were still on). In any case, the continuing illumination of emergency lights after a traffic stop does not prevent consent. *See, e.g., Figueroa-Espana*, 511 F.3d at 702 (holding that whoop of siren does not prevent consent). Finally, LeBon argues that unlike in *Figueroa-Espana* and *Rivera*, Fratzke did not explicitly tell LeBon that he was free to go when Fratzke returned LeBon's papers. But Fratzke implied the same thing by wishing LeBon a "safe trip." Regardless, the Fourth Amendment does not require express advice to leave. *Childs*, 277 F.3d at 954 (citing *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996)).

Since the consensual questioning and search of the trunk did not violate the Fourth Amendment, the judgment of the district court is AFFIRMED.